UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF WISCONSIN

RANDY HANSON,

        Plaintiff,

        v.                                                Case No. 12-C-0822

CAROLYN W. COLVIN
Acting Commissioner of Social Security,

        Defendant.

## DECISION AND ORDER AFFIRMING THE DECISION OF THE COMMISSIONER AND DISMISSING CASE

Randy Hanson appeals the decision of the Commissioner denying his application for Supplemental Security Income benefits. Procedurally, Hanson's application was decided and reviewed three times by the Appeals Council. In this, Hanson's first appeal to federal court, he maintains that he is disabled because of severe back pain, depression and anxiety, as well as personality and cognitive disorders. Although one decision found Hanson disabled as of April 12, 2007, the most recent decision of the Appeals Council found that there are significant jobs available that Hanson can perform.

## Background

Hanson's application filed in 2004 was denied initially on January 28, 2005, and on reconsideration as of April 29, 2005. (Tr. 45-48, 50-50A.) A hearing was held on April 11, 2007, before Administrative Law Judge ("ALJ") Gregory Pokrass. (Tr. 629-70.) Attorney Robert Angermeier, Hanson's counsel, requested that a subpoena be issued to ensure that any opinions offered by the vocational expert ("VE") could be substantiated with documentation. The request was denied, and the ALJ issued a decision finding that

Hanson could perform a significant number of sedentary jobs in the economy. (Tr. 320-39.) The Appeals Council remanded the case to the ALJ for resolution of two issues: (1) assessment of Hanson's psychological impairments using the "B" criteria as required by 20 C.F.R. 416.920a; and (2) to consider the intensity, persistence, and limiting effects of Hanson's alleged symptoms, prior work record, daily activities, the location duration, frequency and intensity of pain or other symptoms, precipitating and aggravating factors, and the type, dosage, effectiveness and side effects of medication. (Tr. 415-17.)

After the second hearing on April 1, 2008, ALJ Pokrass issued a partially favorable decision finding Hanson disabled as of April 12, 2007. (Tr. 465-76.) He found that Hanson's residual functional capacities had eroded to the point he was limited to "part time sedentary" work and as a result, was disabled. Beginning on April 12, 2007, Hanson was limited to working no more than four hours per day, which would preclude sedentary jobs.

In a second remand order dated March 26, 2010, the Appeals Council vacated the entire decision, including the decision to grant Hanson disability in April 2007. (Tr. 494-496.) It concluded that there was no function-by-function assessment of Hanson's ability to do work-related physical and mental activities; there was no evidence of a physical change to support the onset date; and there was a need for further evaluation of Hanson's subjective complaints. (Tr. 494.) Additionally, the Appeals Council indicated that the jobs identified by the VE in connection with the sedentary residual functional capacity exceeded the physical demands of the jobs delineated in the Dictionary of Occupational Titles (DOT). (Tr. 495.) Consequently, the ALJ was ordered to give further consideration to Hanson's maximum residual functional capacity, to further evaluate Hanson's subjective complaints and to provide the rationale, obtain evidence from a medical expert to clarify the nature and

2

Case 2:12-cv-00822-CNC   Filed 09/18/13   Page 2 of 15   Document 28

severity of Hanson's impairments, and obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on Hanson's occupational base. (*Id.*)

ALJ Ritter presided over the third hearing on July 16, 2010. (Tr. 716-763.) During that hearing, Hanson testified that he cannot clean, mow the grass, do dishes or take out the garbage. (Tr. 728.) Occasionally, he will drive a car up to three miles. Hanson further testified that he will not grocery shop with his wife because walking up and down the aisles takes too much out of him. According to Hanson, he spends much time in bed trying to moderate his pain levels. (Tr. 730.)

During the hearing, the VE, Beth Hoynik, identified Hanson's prior work as an "appliance and furniture store loader," a landscape laborer, and an industrial sweeper/cleaner, which was medium and unskilled work. As performed, it was light work because lifting was limited to 20 pounds and it consisted of walking seven hours a day with no sitting. (Tr. 734-763.)

ALJ Ritter found that Hanson had severe impairments of degenerative disc disease of the lumbar spine, a personality disorder and possible low average-borderline intelligence but that he was not disabled and had never been disabled. (Tr. 31-32.) Specifically, he determined that Hanson retained the residual capacity to perform past relevant work as an industrial sweeper/cleaner and other jobs in the national economy. (Tr. 17-32.)

The Appeals Council agreed with the ALJ's findings that Hanson was not engaged in substantial gainful activity since July 27, 2004, has severe impairments which do not meet or equal in severity an impairment, and is able to perform a significant number of jobs in the national economy. (Tr. 13.) However, the Appeals Council did not adopt the ALJ's

conclusions regarding the degree to which Hanson's mental impairment restricted his ability to perform work related activities. (Tr.12.)

## Discussion

This court will uphold a Commissioner's decision if the ALJ applied the correct legal standards and supported the decision with substantial evidence. 42 U.S.C. § 405(g); *Jelinek v. Astrue*, 662 F.3d 805, 811 (7th Cir. 2011). Substantial evidence is "evidence a reasonable person would accept as adequate to support the decision." *Prochaska v. Barnhart*, 454 F.3d 731, 734–35 (7th Cir. 2006). When reviewing for substantial evidence, the court does not displace the ALJ's judgment by reconsidering facts or evidence or making credibility determinations. *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). A decision denying benefits need not address every piece of evidence, but the ALJ must provide "an accurate and logical bridge" between the evidence and his conclusion that a claimant is not disabled. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012).

Hanson first argues that the ALJ erred when discounting the medical opinion of Dr. Misra, the treating neurologist. An ALJ must consider all medical opinions in the record. See 20 C.F.R. § 404.1527(b), (c); *Knight v. Chater*, 55 F.3d 309, 313–14 (7th Cir.1995). Moreover, a treating physician's medical opinion is entitled to controlling weight if it is well supported by objective medical evidence and consistent with other substantial evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). An ALJ need not detail every reason for discounting a treating physician's report, *see Elder v. Astrue*, 529 F.3d 408, 415 (7th Cir. 2008), but must provide a sound explanation for his decision to reject that opinion. *See* 20 C.F.R. § 404.1527(c)(2); *Jelinek*, 662 F.3d at 811; *Schmidt v. Astrue*, 496 F.3d 833, 842 (7th Cir. 2007).

4

Hanson relies on two "opinions" rendered by Dr. Misra. In a letter to Hanson's counsel dated March 22, 2007, Dr. Misra opined as follows:

> My patient, Randy Hanson, has asked me to supply you with information regarding his functional limitations. I have only begun treating Mr. Hanson recently. However, I have had opportunity to review the extensive treatment notes generated primarily by Dr. Tamayo at the Lubsey Clinic. Those records indicate longstanding treatment for degenerative disc and joint disease affecting the lumbar spine with radiculopathy. Plain x-rays taken in November of 2004 showed rotoscoliosis at L2-3 along with degenerative changes and fact degenerative disease affecting the lumber [sic] spine. Dr. Tamayo ordered an MRI on 1/25/05. It showed multi-level degenerative spondylosis of lumber [sic] spine with short pedicles with caused diffused spinal cord narrowing L2 thru L5; superimposed disc disease; and facet arthropathy at L5/S1 (right) was described as "severe'.
>
> Mr. Hanson has consistently complained of pain in his low back as well as radicular pain.
>
> I would anticipate that Mr. Hanson would have a sitting tolerance of 15 to 30 minutes, standing tolerance of 15 minutes, and a walking tolerance of 2 blocks. He should avoid repetitive bending and twisting at the waist. He should lift no more than 10 pounds occasionally. He would need to frequently change positions during the workday and alternate between sitting, standing and walking. I would further anticipate that he could tolerate 4 hours of work activity within these restrictions per day. Working in excess of 4 hours per day would liked [sic] exacerbate his symptoms beyond their current levels.

(Tr. 271.) One year later, Dr. Misra wrote on a prescription pad:

> TO WHOM IT MAY CONCERN
> The patient named above has chronic L-5 spine disease with severe pain & radiculopathy with problems sitting/standing and performing reg. activities of daily living.

(Tr. 463.)

The ALJ gave numerous reasons for rejecting Dr. Misra's opinions, and his explanation was adequate. In examining the length, nature and extent of the treatment relationship, ALJ Ritter first noted that primary treatment had been through Drs. Lubsey

5

and Tamayo of the Lubsey Clinic, who were not back pain specialists. (Tr. 24.) Moreover, the ALJ mentioned that the medical records from this clinic focus on back pain and leg numbness, and that Dr. Tamayo, who specialized in internal medicine referred Hanson to Dr. Vieredra Misra of the Wisconsin Neurology Clinic. The records discussed by the ALJ also reveal that Dr. Misra offered the two opinions set forth above. (*Id.*) Significantly, and as noted by the ALJ, the first opinion was rendered after Dr. Misra saw Hanson on November 10, 2006, and February 7, 2007. (Ex. 15F.) Hence, when Dr. Misra wrote to Hanson's counsel regarding such restrictive limitations, Dr. Misra had seen Hanson twice and he did not have a longitudinal relationship with Hanson. Also, the second opinion was written after just two additional visits on March 23, and July 20, 2007. (Exs. 15F - 17F.)

In addition to the limited treating history, the ALJ commented on "the lack of objective evidence supporting the doctor's restrictive limitations, and the lack of an explanation that would reconcile the difference between the objective and subjective evidence." (Tr. 26.) The ALJ observed that the "actual treatment notes leave much to be desired in terms of documenting the basis for the extreme limitations offered. Furthermore the objectivity of that doctor is brought into question, particularly when he was willing to offer such extreme estimates after conceding that he had only seen claimant twice." (Tr. 28.) Additionally, the ALJ commented that the objective evidence, including x-rays and the MRI scan, did not show nerve root impingement or disc herniation, and Dr. Misra did not make any effort to confirm Hanson's subjective complaints with actual testing. (*Id.*)

Hanson admits that "Dr. Misra's lengthy recitation of the medical evidence he evaluated in connection with the plaintiff did not appear in his treatment notes" but suggests they were summarized in Dr. Misra's narrative report. The court notes that the

6

"narrative report" is the March 22, 2007, letter to Hanson's counsel and the "lengthy recitation" is four sentences in the first paragraph. Hanson also argues that the MRI did not show nerve root impingement or disc herniation because he never asserted that those conditions existed as his doctors clearly identified central spinal stenosis as his underlying problem. However, the ALJ discussed x-rays of January 25, 2005, and the MRI of the lumbar spine which found a "mild-to-moderate degree of overall spinal canal stenosis." (Tr. 25, 205.) The x-rays of the lumbar spine showed leftward rotoscioliosis with diffuse disc space narrowing, minimal endplate degenerative changes noted diffusely, and normal facet degenerative disease at the lower lumbar spine. (Tr. 178.)

The ALJ was entitled to rely upon Dr. Dewitt, the Social Security Administration consultative physician, who distinguished between Hanson's subjective complaints and the absence of a specific dermatomal pattern which would be indicative of a particular disc. (Tr. 28.) The ALJ also referenced Dr. Tamayo's August 8, 2005, entry that Hanson "'continues' to do fairly well." (*Id.*) Because Dr. Misra's opinion was inconsistent with substantial evidence in the record, the ALJ was not required to recontact Dr. Misra for supplemental evidence or testimony, *Skarbek*, 390 F.3d at 504, and could give significant weight to Dr. Dewitt. Ultimately, the ALJ's approach is consistent with the agency's regulations regarding the weight to be given to a doctor's opinion. *See* 20 C.F.R. § 404.1527(c)(2)(i), (ii). Regardless of the weight that this court would afford Dr. Misra's testimony, the ALJ properly took into account the physician's infrequent treatment relationship with Hanson over a limited amount of time, the lack of diagnostic tests and the objective medical evidence in the record.

Next, Hanson argues that the Appeals Council erred in making its credibility findings. The Appeals Council wrote that "the claimant's subjective complaints are not fully credible for the reasons identified in the body of this decision." (Tr. 13.) Earlier in the decision, the Appeals Council considered Hanson's statements concerning the subjective complaints (Social Security Ruling 96-7p) and adopted the ALJ's conclusions in that regard. (Tr. 12.) The ALJ discussed Hanson's pain and credibility at length at pages 9 through 11 of the decision. (Tr. 28-30.)

An ALJ's credibility determination may be overturned only if it is "patently wrong." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). Nevertheless, the ALJ must adequately explain his credibility finding by discussing specific reasons supported by the record. *Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009). A failure to do so could also be grounds for reversal. *See Bjornson v. Astrue*, 671 F.3d 640, 649 (7th Cir. 2012). An ALJ's credibility assessment is afforded special deference because the ALJ is in the best position to see and hear the witness and determine credibility. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000) (citation omitted). Hence, it is only when the ALJ's determination lacks any explanation or support that the court will declare it to be patently wrong and deserving of reversal. *Elder,* 529 F.3d at 413–14.

In this case, the ALJ built an accurate and logical bridge between his findings regarding pain and credibility and the evidence. He noted that the case comes down to Hanson's back and mental status, and acknowledged that there were some abnormalities consistent with degenerative disc disease. However, he also found "nothing that would objectively support the extreme alleged pain levels which the claimant has offered." (Tr. 28.) The ALJ acknowledged Dr. Misra's opinions but questioned his objectivity having

8

seen Hanson twice. He was cognizant of the lack of objective evidence in the record, the inconsistencies in the Lubsey Clinic records regarding Hanson's subjective complaints of numbness in the right foot/leg, and the report from Dr. Dewitt distinguishing between Hanson's subjective complaints and the absence of a specific dermatomal pattern. (*Id.*)

In addition, the ALJ observed there was no evidence of surgery, no orthopedic or neurosurgical evaluation, no significant treatment for mental or physical impairments since the May 16, 2008, decision, no supplemental evidence in the record notwithstanding the opportunity to submit such documentation, Dr. Ertl's "rule out" diagnosis for malingering, and Dr. Nuttall's reliance on Hanson's subjective reports. (Tr. 29.) At page 10 of the decision, the ALJ commented on the absence of any psychological or psychiatric treatment, let alone a longitudinal record of severe mental impairments. (*Id.*) Furthermore, the ALJ took into account that at one point, Hanson reported to a social security case worker that he had not received special education and the Lubsey Clinic notes contained no references to Hanson's problems from a mental health perspective. (*Id.*) Therefore, because the ALJ reviewed the evidence thoroughly and set forth his reasoning, this court cannot find that the ALJ's credibility determination was patently wrong.

Hanson further argues that the Appeals Council erred inasmuch as this case cannot be decided by simple reference to a GRID Rule as a framework. The Appeals Council made the following finding regarding Hanson's RFC:

> The claimant's combination of impairments results in the following limitations on his ability to perform work-related activities: the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b) except that he is further limited to only occasional climbing of ramps or stairs, no climbing of ladders, ropes or scaffolds, frequent balancing, kneeling and crawling, occasional stooping and crouching and must be allowed to sit or stand alternatively at will, provided that he is not off task more than 10% of

9

> the work period. He must avoid concentrated exposure to unprotected heights, hazards, and use of moving machinery and is limited to work involving only simply, routine, and repetitive tasks in a work environment free of fast paced production requirements, involving only simple work related decisions, with few if any work place changes and with only occasional interaction with the public, coworkers and supervisors. In view of the above limitations, the claimant has the residual functional capacity to perform a reduced range of the light exertional level.

(Tr. 13.) Hanson asserts that these limitations erode the light occupational base and that vocational testimony is necessary.

The problem with Hanson's argument is that the Appeals Council stated that it was relying upon the testimony of the VE. (Tr. 12.) At the third hearing on July 16, 2010, Hoynik testified that Hanson had past relevant work as an appliance and furniture store loader (material handler), which is heavy entry level work with a skill level of three, and landscaper (lawn service worker), which is heavy work with a skill level of two. (Tr. 736.) However, commercial or industrial sweeper/cleaner, was medium capacity work with a skill level of two. Moreover, the record indicated that Hanson performed the job at the light level. (Tr. 741.) Notwithstanding a series of progressive restrictions describing Hanson's age, education, work experience, and RFC, Hoynik continued to testify that the industrial sweeper/cleaner position was available as Hanson actually performed the job. (Tr. 742-744.) In addition, Hoynik testified that production/hand packing employment would be appropriate. (Tr. 744.) The combination of light custodial type work, general production, and packing and hand packing jobs resulted in approximately 25,000 positions in the State of Wisconsin. (Tr. 743.)

In response, Hanson asserts that it was an error for the ALJ to rely on Hoynik's testimony when the ALJ also denied his request for a subpoena duces tecum seeking any

10

statistical resources that the vocational expert intended to rely upon. (Tr. 547, 551.) The record shows that on June 17, 2010, ALJ Ritter denied the request because it was "burdensome, overbroad and time-consuming." At the hearing, Hanson renewed his objection to the vocational expert. (Tr. 735.)

The court finds no error where Hanson's counsel had the opportunity to cross-examine Hoynik at the hearing regarding the sources for the data that supported her testimony. (Tr. 752.) Hoynik testified on cross-examination that the figures were obtained from the U.S. Department of Labor, Bureau of Labor Statistics, and the Workforce Development Center in Wisconsin. (*Id.*) Furthermore, prior to the hearing, Hoynik identified the May 2008 State Occupational Employment and Wage Estimate provided by Hanson's counsel. (*Id.*) Additionally, Hoynik explained the method used to extrapolate from the production workers, referenced the DOT and the Occupational Information Network, and cited her own knowledge and experience. (Tr. 755-760.) Also, Hoynik explained her methodology regarding a surveillance system monitor. (Tr. 761-62.)

After the hearing, Hanson filed a VE Report of Attorney David Traver and requested that Hoynik's testimony be stricken as it was not based upon an adequate foundation. (Tr. 588.) However, the ALJ referred to this report and observed that Traver shared many of the criticisms raised by Attorney Angermeier at the hearing. (Tr. 22.) Based on this record, it was reasonable to rely on Hoynik's testimony that Hanson could perform a significant number of jobs in the economy.

In his final argument, Hanson submits that the Appeals Council failed to consider whether he equaled Listing 12.05C. In his briefs to the ALJ and the Appeals Council, Hanson asserted that the IQ testing supports a finding that Hanson equals Listing 12.05C,

11

and cited Program Operations Manual System ("POMS") OMS DI 24515.056, a handbook for internal use at the Social Security Administration addressing medical equivalence in the context of mental disorders.

With due regard for this argument, the court notes that the POMS manual has no legal force and is, therefore, not controlling. *Parker for Lamon v. Sullivan*, 891 F.2d 185, 190 (7th Cir.1989). Regardless, to meet the requisite level of severity of a listed impairment, Hanson was required to satisfy all of the criteria of the listing. *See Rice v. Barnhart*, 384 F.3d 363, 369 (7th Cir. 2004). Where an ALJ fails to mention the specific listing, a remand may be required for his failure to do so when it is combined with a "perfunctory analysis." *Ribaudo v. Barnhart*, 458 F.3d 580, 583–84 (7th Cir. 2006).

Listing 12.05 provides:

12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

....

C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

or

D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

12

> 2. Marked difficulties in maintaining social functioning; or
>
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
>
> 4. Repeated episodes of decompensation, each of extended duration.

20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05.

The ALJ noted possible low average-borderline intelligence as an impairment but found that Hanson did not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 C.F.R. §§ 416.920(d), 416.925 and 416.926. He thoroughly discussed the reports of the consulting psychologists, and commented on Dr. Nuttall's full-scale IQ finding for Hanson of 72 on the Wechsler Adult Intelligence Scale - III with verbal and performance IQs of 74 and 75. (Tr. 27.) Additionally, the ALJ acknowledged Hanson's argument regarding a cognitive disability, but noted that Hanson had failed to substantiate the arguments and that the high school transcript made no reference to special education. (Tr. 24.) Further, Hanson told a Social Security case worker that he had not received special education. (Tr. 29, 76.)

Moreover, Dr. Ertl, the psychological consultative examiner, issued a report that raised questions as to the possibility of Hanson malingering, citing numerous instances where he seemed "to 'feign' difficulty on a number of tasks related to cognitive testing, using 'dramatic speech' when addressing certain subjects, including physical condition, pain, and suicide ideation." (Tr. 27.) ALJ Ritter commented on the lack of psychological or psychiatric treatment with the Wisconsin Disability Determination Services concluding there was "no severe mental impairment with mild difficulty maintaining social functioning

13

and mild difficulties maintaining concentration, persistence, and pace." (Tr. 27, 189-202.) Also noted was the absence of any "psychological or psychiatric treatment, let alone a longitudinal record to support the diagnoses of severe mental impairments," and a reference to Dr. Nuttall's acknowledgment that Hanson's test scores were "likely lower than his actual ability." (Tr. 29.)

On review, the Appeals Council declined to adopt the ALJ's conclusions regarding the degree to which Hanson's mental impairment restricted his ability to perform work related activities. (Tr. 12.) However, the Appeals Council found that the "mental impairments, considered singly and in combination, do not meet or medically equal the criteria of Listing 12.05D, which requires an IQ of 60-70 and at least two marked limitations." The Appeals Council reasoned that the medical evidence indicates that the mental impairments "have resulted in no difficulty in activities of daily living, moderate limitations in activities of social functioning, moderate deficiencies in concentration, persistence and pace and has had no episodes of decompensation." (Tr. 12.) While acknowledging the possible low average borderline intelligence, the Appeals Council found that Hanson did not "have an impairment or combination of impairments, which is listed in, or which is medically equal to an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1." (Tr. 13.) In cases such as this, where two state agency psychologists opined that Hanson's impairments did not meet or equal a listed impairment and there was no medical opinion to the contrary, the failure to refer to a specific listing at step three is not a ground for remand. *Knox v. Astrue*, 327 Fed. Appx. 652, 655 (7th Cir. 2009) (citing *Rice*, 384 F.3d at 369–70, *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004)). Now, therefore,

14

IT IS ORDERED that the decision of the Commissioner is affirmed.

IT IS FURTHER ORDERED that this case is dismissed.

Dated at Milwaukee, Wisconsin, this 18th day of September, 2013.

                                              BY THE COURT

                                              /s/ C.N. Clevert, Jr.
                                              C.N. CLEVERT, JR.
                                              U.S. DISTRICT JUDGE